FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Nov 15 2026

KEVIN P. WEIMER , Clerk

By: Sonya Nuckolls
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

MARIO ANTONIO CASTELLANOS VELAZQUEZ,
LUIS EUCEDA SERRANO, and
ANGEL EUCEDA SERRANO

**CRIMINAL COMPLAINT**

Case Number: 1:26-MJ-1215

I, the undersigned complainant, depose and say under penalty of perjury that the following is true and correct to the best of my knowledge and belief. From at least on or about August 2024 through on or about March 2026, in DeKalb County, in the Northern District of Georgia, and elsewhere, defendants did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown, to make use of the mails and means and instrumentalities of interstate commerce to corruptly demand, seek, receive, accept, and agree to receive and accept, directly and indirectly, anything of value personally and for any other person and nongovernmental entity from a domestic concern and any officer, director, employee, and agent of a domestic concern, in return for: (a) being influenced in the performance of an act and decision in their official capacity; (b) being induced to do and omit to do an act in violation of their lawful duties; (c) conferring an improper advantage; and (d) using their influence to affect and influence an act and decision of a foreign government and instrumentality thereof, in connection with obtaining and retaining business for and with, and directing business to, any person, contrary to Title 18, United States Code, Section 1352, all in violation of Title 18, United States Code, Section 1349.

I further state that I am an FBI Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof. Yes

[signature]

Signature of Complainant
Joshua Berrios

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

November 15, 2026 at Atlanta, Georgia
Date City and State

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

[signature]
Signature of Judicial Officer

AUSA Garrett L. Bradford / 2023r00650 /
Garrett.Bradford@usdoj.gov

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Joshua Berrios, a Special Agent of the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. The Foreign Extortion Prevention Technical Corrections Act, as amended, Title 18, United States Code, Section 1352 et seq. ("FEPA"), was enacted on July 30, 2024, by Congress for the purpose of, among other things, criminalizing the "demand side" of foreign bribery by making it unlawful for any foreign government official to corruptly demand, seek, receive, accept, or agree to receive or accept bribes from certain classes of persons or entities for the purpose of being influenced, being induced to take or omit certain acts, and conferring an improper advantage in connection with obtaining or retaining business for or with, or directing business to, any person.

2. There is probable cause to believe that, beginning at least in or around August 2024 and continuing through at least in or around March 2026, Ada Evila Serrano Nuñez, ("Ada Serrano"), **MARIO ANTONIO CASTELLANOS VELAZQUEZ ("MARIO CASTELLANOS"), LUIS EUCEDA SERRANO ("LUIS EUCEDA"), and ANGEL EUCEDA SERRANO ("ANGEL EUCEDA")** engaged in a bribery scheme in which they made use of the means and instrumentalities of interstate commerce to corruptly demand, seek, receive, accept, and agree to receive and accept bribes to and for the benefit of Ada Serrano and MARIO CASTELLANOS, both government officials at the Honduran Consulate in Atlanta, Georgia, in exchange for Ada Serrano and MARIO CASTELLANOS permitting clients from Consular Services Company #1 ("Consular Services Company"), a private company registered to do

business in Tennessee, to access appointments for services at the Consulate, in violation of FEPA and of Title 18, United States Code, Section 1349.

## AGENT BACKGROUND

3. I have been a Special Agent with the FBI since 2020. Upon being hired as a Special Agent with the FBI, I attended the FBI Academy in Quantico, Virginia, where I received extensive training on investigating various violations of federal law. Since May 2021, I have been assigned to the FBI Atlanta's Public Corruption Squad. During my time with the FBI, I have investigated potential violations of federal laws, including those relating to bribery and corruption.

4. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses. The FBI is responsible for the enforcement of federal laws, including those related to bribery and corruption such as FEPA. As an FBI Special Agent, I have received training and conducted or assisted in numerous federal criminal investigations. I have experience with the techniques used in such investigations including the use of cooperating witnesses, physical surveillance, consensual monitoring/recording, analysis of telephone toll records, electronic surveillance, and search and seizure warrants.

5. The facts in this affidavit come from my personal observations; my training and experience; and information obtained from other agents, law enforcement, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. The grounds for issuance of this warrant come from my personal knowledge of matters set out in this affidavit. To the extent any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of records provided by

financial institutions and interviews of witnesses, and through reliable law enforcement sources, including discussions with other law enforcement agents, which has caused me to believe the information to be true.

**RELEVANT INDIVIDUALS AND ENTITIES**

7. At all times relevant to this affidavit:

8. Ada Serrano was a Honduran citizen and resided in Suwanee, Georgia. Ada Serrano served as Consul General at the Honduran Consulate in Atlanta, Georgia (the "Consulate"), from approximately July 2022 through March 2026. Ada Serrano was a "foreign official," as that term is defined in FEPA, Section 1352(a)(1).

9. Defendant LUIS EUCEDA SERRANO ("LUIS EUCEDA") was a Honduran citizen and resided in the Northern District of Georgia. LUIS EUCEDA was Ada Serrano's son.

10. Defendant ANGEL EUCEDA SERRANO ("ANGEL EUCEDA") was a Honduran citizen and resided in the Northern District of Georgia. ANGEL EUCEDA was Ada Serrano's son.

11. Defendant MARIO ANTONIO CASTELLANOS VELAZQUEZ ("MARIO CASTELLANOS") was a dual United States and Honduran citizen and resided in the Northern District of Georgia. MARIO CASTELLANOS was employed at the Consulate. MARIO CASTELLANOS was a "foreign official," as that term is defined in FEPA, Section 1352(a)(1).

12. Consular Services Company was a private company registered to do business in Tennessee. Consular Services Company provided interstate transportation, scheduling, and document preparation services to individuals who sought services at the Consulate and similar

government offices. Consular Services Company was a "domestic concern," as that term is used in FEPA, Section 1352(b)(1)(A)(iii).

13. Individual #1 was a citizen of the United States and Honduras, and resided in the Middle District of Tennessee. Individual #1 was an owner of Consular Services Company. Individual #1 was a "domestic concern" and an "officer," "employee," and "agent" of a domestic concern, as those terms are used in FEPA, Section 1352(b)(1)(A)(iii).

14. Individual #2 was a Honduran citizen and resided in Middle District of Tennessee. Individual #2 was an employee of Consular Services Company. Individual #2 was a "domestic concern" and an "employee" and "agent" of a domestic concern, as those terms are used in FEPA, Section 1352(b)(1)(A)(iii).

15. Consulate Employee #1 ("Consulate Employee") was a Mexican citizen and resided in the Northern District of Georgia. Consulate Employee was employed at the Consulate until in or around January 2025.

**<u>BRIBERY SCHEME</u>**

16. Beginning at least in or around July 2023, and continuing until in or around March 2026, Ada Serrano, while serving as Consul General of Honduras in Atlanta, Georgia, together with LUIS EUCEDA, ANGEL EUCEDA, and MARIO CASTELLANOS, agreed to and did demand and receive bribes from Individual #1, Individual #2, Consular Services Company, and others in connection with obtaining and retaining business for Consular Services Company, including by, among other things, authorizing, facilitating, and prioritizing access to appointments for Consular Services Company's clients at the Consulate in exchange for the bribes.

17. In general, Honduran nationals, travelers, and citizens living in the United States who sought services at the Consulate—such as obtaining passports and travel documents, notary services, and other civil records—were required to schedule an appointment through the Consulate's online appointment system and attend those appointments with the required documentation and information. Under that system, the Consulate offered a limited number of appointments per day.

18. As part of its business, Consular Services Company scheduled appointments for its clients at the Consulate and provided them with transportation to and from the Consulate and Tennessee. Consular Services Company charged its clients for scheduling the appointments and transporting them to and from the Consulate. Prior to Ada Serrano's appointment as Consul General, Consular Services Company was not required to pay the Consulate, or any consular employee, to arrange for their clients to access appointments at the Consulate to obtain consular services.

19. In or around at least July 2023, however, Ada Serrano instructed Consulate Employee, who was then working as a security guard at the Consulate, to require Individual #1 and Individual #2 to pay a bribe for each person who Consular Services Company transported to the Consulate.

20. In general, Consular Services Company charged each of its clients approximately $300 for assisting them in obtaining services at the Consulate. This amount covered transportation to and from the Consulate and the cost of the bribes demanded by Ada Serrano.

21. In exchange for the bribes, Ada Serrano allowed Consular Services Company to gain access to appointments at the Consulate that they would otherwise be denied. This access

allowed Consular Services Company's clients to attend the appointments necessary to secure passports, identification documents, and other services from the Consulate. Ada Serrano directed Consulate Employee and MARIO CASTELLANOS to coordinate directly with Individual #1 and Individual #2 to ensure Consular Service Company's clients were allowed into the Consulate after they paid the bribes.

22. In or around October 2023, Ada Serrano directed Consulate Employee to take various steps to hide the scheme and avoid detection, including limiting Consular Services Company and its clients to a maximum of fifteen (15) consulate appointments per day. In particular:

a. On or about October 9, 2023, Ada Serrano sent a message to Consulate Employee via Telegram, stating (as translated from the original Spanish) "Hi. I'm here. I'll call you. It's more private that way."

b. Later that same day, also on or about October 9, 2023, Ada Serrano met with LUIS EUCEDA, ANGEL EUCEDA, and Consulate Employee at Ada Serrano's home. During the meeting, Ada Serrano stated (as translated from the original Spanish), among other things:

> [F]or now, we have to keep a very low profile. And the short guy—he better not start bringing in more people than the number I told him, right? Up to 15, if possible fewer. . . .
>
> [T]here might be cameras. I'm scared, please be careful. . . .
>
> I want to check under my desk because that's where they put the microphones. . . .
>
> [T]omorrow cover up the vents for me because I have my doubts—I think there are cameras there. And they can see you right there when you're handing me that list. . . .

23. From in or around July 2023, through in or around December 2024, at Ada Serrano's direction, Consulate Employee collected the bribes from Individual #1 and Individual #2 on Ada Serrano's behalf.

24. From in or around January 2025 through in or around March 2026, at Ada Serrano's direction, MARIO CASTELLANOS collected the bribes from Individual #1 and Individual #2 on Ada Serrano's behalf.

25. To conceal the proceeds derived from the scheme, from in or around July 2023, through at least in or around December 2024, Ada Serrano directed Consulate Employee to distribute most of the cash bribes collected from Individual #1 and Individual #2 to LUIS EUCEDA and ANGEL EUCEDA. LUIS EUCEDA and ANGEL EUCEDA then made cash deposits of between $100 and $6,000 into their personal bank accounts in the Northern District of Georgia, which LUIS EUCEDA and ANGEL EUCEDA also used in connection with their businesses.

26. On a few occasions in or around 2024, Consulate Employee delivered the cash bribes collected from Individual #1 and #2 directly to Ada Serrano.

27. In furtherance of the conspiracy:

a. On or about August 9, 2024, Ada Serrano caused Consulate Employee to deliver approximately $4,000 in cash to ANGEL EUCEDA.

b. On or about September 10, 2024, Ada Serrano caused Individual #2 to pay approximately $1,700 in cash to Consulate Employee, which Consulate Employee collected for the benefit of Ada Serrano, LUIS EUCEDA, and ANGEL EUCEDA.

c. On or about October 18, 2024, during a phone call between LUIS EUCEDA and Consulate Employee, Consulate Employee indicated having approximately $4,900 to deliver, and stated that Ada Serrano had asked Consulate Employee to speak to ANGEL EUCEDA to find out what Consulate Employee (as translated from the original Spanish) "should do with the money."

d. On or about October 18, 2024, on a subsequent phone call between ANGEL EUCEDA and Consulate Employee, ANGEL EUCEDA stated that Ada Serrano had told ANGEL EUCEDA (as translated from the original Spanish): "Tell [Consulate Employee] that he should, that he should give me the money."

e. On or about December 22, 2024, in a WhatsApp message and voice note from Ada Serrano, while Ada Serrano was located outside Georgia, to Consulate Employee, while Consulate Employee was located within the Northern District of Georgia, Ada Serrano stated (as translated from the original Spanish) that she was keeping "track of all the appointments that have been made" and instructed Consulate Employee to "save me 2,000 and give it to me when I get there."

**CRIMINAL CHARGES**

28. Based on the information described above, I believe that probable cause exists for the issuance of a Criminal Complaint charging MARIO CASTELLANOS, LUIS EUCEDA, and ANGEL EUCEDA with conspiracy to violate FEPA (18 U.S.C. § 1349):

29. From at least in or around August 2024, through at least in or around March 2026, in the Northern District of Georgia and elsewhere, Ada Serrano and MARIO ANTONIO CASTELLANOS VELAZQUEZ, being foreign officials, and LUIS EUCEDA SERRANO and ANGEL EUCEDA SERRANO, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown, to make use of the mails and means and instrumentalities of interstate commerce for Ada Serrano and MARIO CASTELLANOS to corruptly demand, seek, receive, accept, and agree to receive and accept, directly and indirectly, anything of value personally and for any other person and nongovernmental entity from a domestic concern and any officer, director, employee, and agent of a domestic concern (Individual #1, Individual #2, and Consular Services Company), in return for: (a) being influenced in the performance of an act and decision in their official capacity; (b) being induced to do and omit to do an act in violation of their lawful duties; (c) conferring an improper advantage; and (d) using their influence to affect and influence an act and decision of the Honduran government and the Consulate, in connection with obtaining and retaining business for and with, and directing business to, Individual #1, Individual #2, and Consular Services Company, contrary to Title 18, United States Code, Section 1352, in violation of Title 18, United States Code, Section 1349.

Purpose of the Conspiracy

30. It was a purpose of the conspiracy for Ada Serrano, LUIS EUCEDA, ANGEL EUCEDA, and MARIO CASTELLANOS, to enrich themselves by corruptly demanding and accepting bribes from Individual #1, Individual #2, and Consular Services Company in exchange for permitting Consular Services Company's clients to access appointments for services at the Consulate.

<u>Manner and Means of the Conspiracy</u>

31. The manner and means by which Ada Serrano, LUIS EUCEDA, ANGEL EUCEDA, and MARIO CASTELLANOS sought to accomplish, and did accomplish, the purpose of the conspiracy included, among other ways, the following:

a. It was part of the conspiracy that Ada Serrano and MARIO CASTELLANOS, together with LUIS EUCEDA and ANGEL EUCEDA, would and did demand, seek, receive, and accept bribes, directly and indirectly, from Individual #1, Individual #2, and Consular Services Company, in connection with obtaining and retaining business for Consular Service Company, including through, among other ways, authorizing, facilitating, and prioritizing access to appointments for Consular Services Company's clients.

b. It was further part of the conspiracy that Ada Serrano would and did cause Consulate Employee to prevent Consular Service Company's clients from entering the Consulate unless Individual #1 or Individual #2 paid a bribe to Ada Serrano for each appointment.

c. It was further part of the conspiracy that Ada Serrano would and did cause Consulate Employee and MARIO CASTELLANOS to collect bribes on her behalf from Individual #1 and Individual #2.

d. It was further part of the conspiracy that Ada Serrano would and did take steps to conceal her involvement in the scheme by, among other ways: (a) sharing information regarding Consular Service Company's appointments via encrypted messaging applications (*e.g.*, WhatsApp, Telegram); (b) limiting the number of appointments that Individual #1 and Individual #2 could schedule

per day to avoid detection; (c) instructing Consulate Employee and MARIO CASTELLANOS to collect bribes on Ada Serrano's behalf; and (d) instructing Consulate Employee, in most instances, to deliver the bribes to LUIS EUCEDA and ANGEL EUCEDA.

e. It was further part of the conspiracy that LUIS EUCEDA and ANGEL EUCEDA furthered the scheme by accepting receipt of the bribes from Consulate Employee, and thereafter making incremental, low-value cash deposits, including by ATM, into their personal bank accounts.

All in violation of Title 18, United States Code, Section 1349.